## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SARAH HALCOMB, | ) | CASE NO. 3:13-CV-2197 |
| | ) | |
| Plaintiff, | ) | JUDGE ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | | |

Plaintiff, Sarah Halcomb ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying the Commissioner's final decision that she is no longer disabled.  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

### I.   PROCEDURAL HISTORY

Plaintiff received supplemental security income benefits based on disability as a child. (Transcript ("Tr.") 26.)  On October 26, 2007, after Plaintiff attained the age of 18, the Social Security Administration ("Agency") reviewed her eligibility for benefits and determined that Plaintiff was no longer disabled as of October 31, 2007.  (*Id*.)  An internal error delayed processing of this decision until January 2009.  (*Id*.)  In August 2009, a state agency disability hearing officer upheld that determination, and Plaintiff

requested a hearing before an administrative law judge ("ALJ").  (*Id*.)

In October 2007, while her redetermination decision was pending, Plaintiff filed an application for child's insurance benefits, alleging disability beginning on April 1, 1990.  (*Id*.)  The application was denied initially and upon reconsideration, and, in January 2009, Plaintiff requested an administrative hearing.  (*Id*.)

On May 20, 2011, an ALJ conducted an administrative hearing on the redetermination decision and on Plaintiff's October 2007 application.  (*Id*.)  Plaintiff was not represented by counsel at that hearing.[1]  (*Id*.)  A vocational expert testified. (*Id*.)  On July 29, 2011, the ALJ issued a decision determining that Plaintiff was not disabled under the Social Security Act ("Act'), and denying her applications for benefits.  (Tr. 26-36.)  On August 2, 2013, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.  (Tr. 3.)

On October 4, 2013, Plaintiff, through counsel, filed her Complaint in this Court, challenging the decision of the Commissioner.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 20, 23.)  Plaintiff generally argues that: (1) substantial evidence does not support the ALJ's decision because the ALJ's hypothetical to the VE failed to accurately portray Plaintiff's impairments; and (2) the

---

[1] Plaintiff initially appeared before the ALJ on April 4, 2011, but the ALJ postponed the hearing to allow Plaintiff to retain counsel.  (Tr. 174.)  In this Court, Plaintiff, through counsel, moved to supplement the record with the transcript of Plaintiff's April 2011 proceedings.  (Doc. No. 16.)  Plaintiff's Brief makes the same request.  (Doc. No. 15.)  After the Commissioner responded by averring that the proceedings in April 2011 were not transcribed.  (Doc. No. 21.)  Thereafter, the undersigned denied the motion, noting that Plaintiff had neither established that there was a prior recorded hearing at which testimony was taken, nor offered any explanation for why she required access to the transcript of a proceeding that was ultimately postponed and rescheduled.  (Doc. No. 22.)

2

ALJ failed to adequately develop the record.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in May 1989 and was 22 years old when the ALJ issued his decision.  (Tr. 103.)  She graduated from high school.  (Tr. 215.)  She had no past relevant work.  (Tr. 34.)

### B.    Medical Evidence

#### 1.    Plaintiff's Providers

On September 25, 2007, pediatric neurologist Donald Cameron, M.D., examined Plaintiff.  (Tr. 205-07.)  He noted Plaintiff's history of epilepsy, but observed that Plaintiff "has been seizure free for over 6 years."  (Tr. 205.)  He noted that Plaintiff was "doing well," and that she had been weaned off her anti-seizure medication in February 2005. (*Id*.)  Dr. Cameron opined that he no longer needed to follow her as a patient, and instructed her to see if an adult neurologist if she had future neurological problems.  (Tr. 207.)

#### 2.    Agency Reports

On August 27, 2007, state agency consulting psychologist Mark D. Hammerly, Ph.D., examined Plaintiff and administered the Wechsler Adult Intelligence Scale III ("WAIS-III") and the Wide Range Achievement Test 4 ("WRAT-4").  (Tr. 194-203.) Plaintiff reported that she was in 12th grade and was taking special education classes. (Tr. 195.)  Dr. Hammerly noted that Plaintiff was five feet, three inches tall and weighed

3

185 pounds.  (*Id.*)  Plaintiff reported a history of epilepsy that was "under control."  (*Id.*)

The WAIS-III revealed a verbal IQ of 77, a performance IQ of 78, and a full scale IQ of 76, which Dr. Hammerly characterized as within the borderline range of intellectual functioning.  (Tr. 199.)  He opined that Plaintiff's results were "generally valid and reliable, as well as roughly within the limit[ations] expected given [Plaintiff's] stated academic history."  (*Id.*)  The WRAT-4 revealed that Plaintiff's word reading ability and spelling were at the fourth grade level; her sentence comprehension ability was at the fifth grade level; and her ability to perform mathematical computations was at the second grade level.  (*Id.*)

Dr. Hammerly diagnosed Plaintiff with learning disorder, not otherwise specified; and borderline intellectual functioning.  (Tr. 201.)  He determined that Plaintiff was "mildly impaired" in her ability to: relate to others, including fellow workers and supervisors; understand, remember and follow instructions; maintain attention, concentration, persistence and pace to perform simple, repetitive tasks.  (Tr. 201-02.)  She was moderately impaired in the ability to withstand the stress and pressures associated with day-to-day work activities.  (Tr. 202.)  He opined that Plaintiff would be "able to relate sufficiently to coworkers and supervisors for simple, repetitive tasks which did not require complicated or detailed verbal instructions and procedures."  (Tr. 201.)

On April 8, 2008, agency consulting psychologist Christopher Layne, Ph.D., examined Plaintiff.  (Tr. 239-44.)  He opined that there was "some evidence of retardation," noting that Plaintiff repeated kindergarten and received grades ranging from A's to F's.  (Tr. 240.)  He also noted that Plaintiff's speech latency was long; her

speech velocity was slow; and her speech quantity was low with a simple vocabulary.
(Tr. 241.)  The WAIS-III revealed a verbal IQ score of 62, a performance IQ score of 70,
and a full scale IQ score of 63, in the "mildly retarded range."  (Tr. 242.)  Her WRAT-4
score revealed that she was "mildly impaired."  (*Id*.)  Dr. Layne opined that Plaintiff's
cognitive test scores were "low estimates" and that Plaintiff was "mildly retarded."  (*Id*.)
He diagnosed her with dysthymic disorder and mental retardation.  (Tr. 242-43.)  He
opined that she was mildly impaired in her ability to: follow instructions; maintain
attention to perform simple, repetitive tasks; relate to others, including coworkers; and
withstand day-to-day work stress.  (Tr. 243.)

On May 8, 2008, agency consulting psychologist David Dietz, Ph.D., performed a
mental residual functional capacity ("RFC") assessment and a psychiatric review
technique.  (Tr. 246-49, 250-63.)  He opined that Plaintiff was markedly limited in her
ability to understand and remember detailed instructions; and carry out detailed
instructions.  (Tr. 246.)  He concluded that she was moderately limited in her ability to:
remember locations and work-like procedures; understand and remember very short
and simple instructions; carry out very short and simple instructions; maintain attention
and concentration for extended periods; complete a normal workday and workweek
without interruptions from psychologically based symptoms and to perform at a
consistent pace without an unreasonable number and length of rest periods; and
respond appropriately to changes in the work setting.  (Tr. 246-47.)  Dr. Dietz opined
that Plaintiff was "capable of completing simple repetitive tasks in an environment that
does not require strict adherence to production standards or schedules and does not
require her to supervise the behaviors of others.  She could learn new tasks after a brief

5

demonstration period."  (Tr. 248.)

in his psychiatric review technique, Dr. Dietz opined that Plaintiff had borderline intellectual functioning, but did not satisfy Listing 12.05.  (Tr. 254.)  He assigned Plaintiff mild limitations in daily activities and maintaining social functioning; and a moderate limitation in maintaining concentration, persistence and pace.  (Tr. 260.)

On December 4, 2008, agency consulting psychologist Bonnie Katz, Ph.D., performed a case analysis and gave "great weight" to Dr. Hammerly's opinion.  (Tr. 266.)  Dr. Katz opined that Dr. Layne's opinion regarding Plaintiff's mild impairments were "not supported by the findings as reported in the c[onsultative] e[xamination] itself."  (*Id*.)  Rather, according to Dr. Katz, "moderate limits in ability to manage the stresses of daily work are supported" by Dr. Layne's description of Plaintiff and Plaintiff's own self-reported functioning.  (*Id*.)

On February 18, 2009, agency consulting psychologist Douglas J. Pawlarczyk, Ph.D., performed a mental RFC assessment and a psychiatric review technique. (Tr. 268-73, 274-85.)  He assigned Plaintiff the same limitations as Dr. Dietz, except that Dr. Pawlarczyk opined that Plaintiff was also moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 268.)  In his psychiatric review technique, Dr. Pawlarczyk assigned Plaintiff the same limitations that Dr. Dietz had assigned her.  (Tr. 282.)

On June 25, 2009, state agency consulting psychologist Timothy F. Wynkoop, Ph.D., examined Plaintiff.  (Tr. 288-98.)  He noted that, at that time, Plaintiff intended to study to become a dental assistant, but was struggling academically.  (Tr. 288.)  He noted a history of special education for a learning disability, learning accommodations

6

and a seizure disorder.  (*Id.*)

The WAIS-III revealed a verbal IQ of 81, a performance IQ of 98, and a full scale IQ of 88.  (Tr. 291.)  Dr. Wynkoop noted that Plaintiff demonstrated "difficulties with sustained attention, impulsive responding, organization and planning, verbal working memory, slow auditory-verbal learning (but benefits nicely from repetition), calculations, alphanumeric processing, concept formation, and construction."  (Tr. 294.)  He diagnosed Plaintiff with: attention deficit hyperactivity disorder ("ADHD"); cognitive disorder, not otherwise specified; mathematics disorder; learning disorder, not otherwise specified; and phase of life problems.  (Tr. 295.)  He opined that she would "do best at hands-on on-the-job or vocational training, preparing for a primarily hands-on profession."  (Tr. 296.)

On May 4, 2011, state agency consulting psychiatrist Daniel K. Watkins, Ph.D., examined Plaintiff and completed a medical source statement.  (Tr. 299-305, 306-08.) He completed the Wechsler Adult Intelligence Scale IV ("WAIS-IV"), which revealed a verbal IQ of 72, a perceptual reasoning IQ of 75, a working memory IQ of 63, a processing speed IQ of 71, and a full scale IQ of 65.  (Tr. 305.)  Dr. Watkins noted that her full scale IQ placed Plaintiff in the "mildly retarded range," but opined that this was "an underestimate of her actual level of functioning."  (Tr. 303, 304.)  He opined that her "overall intellectual/adaptive functioning appears to be borderline," and diagnosed her with borderline intellectual functioning.  (Tr. 303.)  He opined that Plaintiff would have "no difficulty with simple, concrete instructions," but would "require more repetition or explanation of instructions than would a typical worker."  (Tr. 304.)

In his medical source statement, Dr. Watkins assigned Plaintiff moderate

7

limitations in the ability to: understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions.  (Tr. 306.)  He assigned Plaintiff no limitations in the ability to: understand and remember simple instructions; carry out simple instructions; make judgments on simple work-related decisions; and interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting.  (Tr. 306-07.)

**C.     School Records**

A February 2008 individual education plan ("IEP") reflected that Plaintiff met the criteria for a learning disability.  (Tr. 219.)  The report described Plaintiff as "well-behaved and likable," and noted that her reading and writing abilities were below that of her peers.  (Tr. 220.)  She received special education assistance.  (*Id*.)  The IEP noted that she required "classroom work to be presented to her at a slow pace, in small group settings, and the assistance of a special education teacher."  (Tr. 221.)  The plan called for Plaintiff to be exempted from the requirements of the Ohio Graduation Test in math and science, but noted that she had passed the test in reading, writing and citizenship. (Tr. 223.)  According to the report, a Wechsler Intelligence Scale for Children III ("WISC-III") performed in October 1998, when Plaintiff was 9, revealed a verbal IQ of 85, a performance IQ of 81, and a full scale IQ of 82.  (Tr. 235.)  A WISC-III performed in November 2001, when Plaintiff was 12, revealed a verbal IQ of 82, a performance IQ of 77, and a full scale IQ of 77.  (*Id*.)  The IEP team opined that, absent special education services, Plaintiff failed to meet the state-approved grade level standards in: oral expression, listening comprehension, written expression, reading comprehension, mathematics calculation, and mathematics problem solving.  (Tr. 237.)

8

According to her high school records, Plaintiff received grades ranging from A's to D's.  (Tr. 215.)  In June 2007, Plaintiff was ranked 55th in a class of 209 and earned a grade point average of 2.7219.  (*Id*.)  Plaintiff graduated from high school in June 2008.  (*Id*.)

**D.    Hearing Testimony**

The ALJ conducted Plaintiff's administrative hearing on May 20, 2011.  (Tr. 351.)  The hearing, at which Plaintiff appeared *pro se*, commenced at 12:10 p.m. and ended at 12:35 p.m.  (Tr. 351, 366.)

**1.    Plaintiff's Hearing Testimony**

At the administrative hearing, Plaintiff testified as follows:

She attended special education classes at school.  (Tr. 358.)  She had particular difficulties with mathematics and reading.  (*Id*.)  Plaintiff could read words but did not comprehend the meaning of what she was reading.  (*Id*.)  Although she occasionally shopped on her own, she used her bank card to pay because she didn't "deal with cash."  (Tr. 359.)

Plaintiff cared for her two children while her boyfriend was at work.  (Tr. 360.)  She performed household chores, such as cooking and cleaning.  (*Id*.)  Plaintiff felt that she was "very shy" and "g[ot] nervous a lot."  (Tr. 361.)

**2.    Vocational Expert's Hearing Testimony**

The ALJ described a hypothetical individual of Plaintiff's age and vocational background who had "no exertional limitations but was limited to simple, routine, repetitive work that had no fast paced production requirements."  (Tr. 363.)  The VE

9

opined that the hypothetical individual could perform work as a cleaner/housekeeper (Specific Vocational Profile ("SVP") of 2, Dictionary of Occupational Titles ("DOT") number 323.687-014), a sales attendant (SVP 2, DOT 299.677-018), or a cafeteria attendant (SVP 2, DOT 311.677-010).  (Tr. 364.)

The ALJ asked the VE whether the hypothetical individual could perform the work the VE had identified with the additional limitation of only occasional interaction with the public.  (Tr. 364-65.)  The VE responded that the limitation would eliminate the sales attendant job, but opined that the remaining jobs were "simple, repetitive, so I would think it would only have occasional decision making, I mean they're fairly routine." (Tr. 365.)

The ALJ asked the VE to identify an additional job that the hypothetical individual could perform, absent the sales attendant job, and the VE responded with laundry porter (SVP 2, DOT 361.687-014).  In response to questions from the ALJ, the VE indicated that the cleaner/housekeeping job had a reasoning level of 1, and that the cafeteria and laundry porter jobs had a reasoning level of 2.  (Tr. 365-66.)

### III.   STANDARD FOR DISABILITY

Where a claimant under the age of 18 years receives benefits on the basis of a disability, the Act requires the Commissioner to periodically review that individual's eligibility for benefits, including during the one-year period after that individual attains the age of 18 years.  42 U.S.C. § 1382c(a)(3)(H)(iii).  Where the claimant has attained the age of 18, the Commissioner applies the criteria used in determining initial eligibility for individuals who are over the age of 18.  42 U.S.C. § 1382c(a)(3)(H)(iii)(I).  Under this criteria, a claimant is entitled to receive benefits under the Act when she establishes

disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

11

prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  Plaintiff attained the age of 18 in May 2007 and was eligible for Supplemental Security Income benefits as a child for the month proceedings the month in which she attained age 18.  Plaintiff was notified she was no longer disabled as of October 31, 2007, based on redetermination of disability under the rules for adults who file new applications.

2.  Born in May 1989, Plaintiff had not attained the age of 22 as of April 1, 1990, the alleged onset date.

3.  Plaintiff has not engaged in substantial gainful activity since April 1, 1990, the alleged onset date.

4.  Plaintiff has the severe impairment of borderline intellectual functioning.

5.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I ("Listings").

6.  Plaintiff has the RFC to perform a full range of work at all exertional levels but with the non-exertional limitation that she is limited to simple routine, repetitive tasks and goal-oriented rather than production pace work (no fast pace).

7.  Plaintiff has no past relevant work.

★   ★   ★[2]

9.  Plaintiff has at least a high school education and is able to communicate in English.

---

[2] In his eighth finding of fact and conclusion of law, the ALJ stated, "[Plaintiff] was born [in May 1989] and was 9 years old, which is defined as a younger individual age 18-49, on [April 1, 1990], the alleged onset date."  (Tr. 34.)  This is obviously an error, as Plaintiff was not even one year old on April 1, 1990, and a nine-year old individual is not a "younger individual age 18-49."  Neither party, however, addresses this error.

12

* * *

11.     Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

12.     Plaintiff has not been under a disability, as defined in the Act, from October 31, 2007 through July 29, 2011, the date of the ALJ's decision.

(Tr. 29-36.)

## LAW & ANALYSIS

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

13

adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

Plaintiff asserts numerous reasons that substantial evidence does not support either the ALJ's hypothetical to the VE or the ALJ's determination of Plaintiff's RFC. These reasons generally concern: (1) the ALJ's determination of Plaintiff's severe impairments; (2) the ALJ's assessment of Plaintiff's IQ scores; and (3) the ALJ's determination that Plaintiff was capable of performing the work identified by the VE. She also contends that the ALJ failed to fully develop the record at the May 2011 administrative hearing.[3] Given the numerosity of Plaintiff's arguments and the fact that many of them address similar issues, the undersigned has grouped them together.

**1.      Plaintiff's Severe Impairments**

In his decision, the ALJ determined that Plaintiff had the severe impairment of borderline intellectual functioning. (Tr. 29.) Plaintiff argues that the ALJ erred in failing

---

[3] Plaintiff's Brief also raises numerous other issues in a perfunctory manner. For example, Plaintiff argues that, "It is true that Dr. Wynkoop found [higher IQs than other psychologists in the record], but the higher IQ's counsel asserts would on its face, be totally inconsistent with special education classes – unless there were some 'other mental or cognitive' disorders other than B[orderline] I[ntellectual] F[unctioning], that are present. Clearly an IQ below 80 would constitute a severe mental impairment." (Plaintiff's Brief ("Pl. Br.") at 12 (grammar and punctuation as in original).) Plaintiff's Brief is replete with other similarly conclusory arguments. By failing to develop these arguments, Plaintiff has waived them. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

to address whether her other conditions – specifically, ADHD, cognitive disorder, mathematics disorder, learning disorder, asthma and obesity[4] – constituted severe impairments.  This argument lacks merit because, even if the ALJ erred in failing to consider these other conditions, any error was harmless.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  An ALJ must consider all of a claimant's impairments, severe and not severe, at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

---

[4] In her Brief, Plaintiff incorrectly asserts that "there is nothing in Finding No. 4 concerning Plaintiff's history of . . . seizures."  (Pl. Br. at 10.)  In his fourth finding of fact and conclusion of law, the ALJ discussed Plaintiff's history of seizures, but declined to name that condition as a severe impairment because the record reflected that Plaintiff had not had a seizure in some time.  (Tr. 29.)  Further, Plaintiff contends that the ALJ should have assigned limitations related to this condition because Plaintiff "still has this past history, and is more prone to onset of seizure activity."  (Pl. Br.at 10-11.)  Plaintiff points to no medical evidence in the record that supports this argument.

Here, although the ALJ did not consider whether Plaintiff's other conditions were severe, he found that her borderline intellectual functioning was a severe impairment.  Accordingly, Plaintiff cleared step two of the analysis.  *See Anthony*, 266 F. App'x at 457.  Plaintiff acknowledges that the ALJ's finding of a single severe impairment required the ALJ to continue the analysis in her case.  She argues, however, that, because the ALJ did not discuss whether these other conditions were severe impairments, the ALJ's decision "strips [this Court] of the ability to determine how and in what way these other impairments were considered."  (Pl. Br. 10.)  This argument lacks merit, for two reasons.

First, review of the ALJ's decision reveals that he discussed the diagnoses of the various cognitive and mental conditions rendered by Plaintiff's examining psychologists, and then further discussed the weight he assigned to the opinions of those psychologists regarding Plaintiff's capabilities.  (Tr. 33-34.)  Accordingly, the ALJ's decision provides sufficient information for this Court to review the ALJ's reasoning with respect to these various conditions.

Second, although Plaintiff is correct in noting that the ALJ did not discuss the effect of Plaintiff's obesity and asthma on her ability to function, to the extent that such a failure is error, that error is harmless.  It is well established that the claimant bears the burden of establishing the severity of the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled],

16

*when the claimant is proving the extent of his impairments*.") (emphasis added).  Here, although the record contains evidence that Plaintiff had asthma and was obese, she offers no evidence that these conditions interfered with her ability to perform basic work activities.  Nothing in the record provides any evidence regarding the severity of these conditions, and no medical source rendered any opinion regarding limitations that resulted from these conditions.  *See, e.g.,* *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) ("The mere fact that plaintiff suffered from a dysthymic disorder . . . does not automatically entitle plaintiff to the receipt of benefits.  Rather, in order to qualify for the receipt of benefits . . . plaintiff must show that she was disabled by her dysthymic disorder."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").  Accordingly, Plaintiff failed to sustain her burden of proof with respect to whether her asthma and obesity constituted a severe impairments that merited further limitations in her RFC.

### 2. Plaintiff's IQ Scores

Plaintiff generally argues that the ALJ improperly assessed Plaintiff's IQ scores, particularly with respect to whether Plaintiff satisfied Listing 12.05(C), which, *inter alias*, requires a full scale IQ score of 60 through 70.  Specifically, Plaintiff contends that the ALJ "cherry picked" the highest scores from the record and relied on them to determine that Plaintiff did not satisfy Listing 12.05(C).  She also argues that substantial evidence does not support the ALJ's assessment of these IQ scores because the ALJ erred in pointing to Plaintiff's performance in school to justify his reliance on the higher scores in the record.  These arguments lack merit because substantial evidence supports the

17

ALJ's assessment of the IQ scores obtained by the various sources in the record.

In his discussion of Listing 12.05(C), the ALJ noted that Plaintiff had IQ scores within the required range, but determined that they were not valid:

> Although [Plaintiff] had test scores in the range of 60 through 70, these were not considered valid test scores . . . and appeared to underestimate [Plaintiff's] actual level of intellectual functioning, based upon other evidence of record, including her school records.

(Tr. 30.)  Later in his decision, the ALJ discussed the various IQ score results contained in the record, noting that: (1) Plaintiff's other IQ scores were "consistently between low average range and borderline intellectual functioning"; (2) although the scores obtained by Dr. Layne (full scale IQ of 63) were "significantly lower than those obtained by other medical sources," those scores "underestimated [Plaintiff's] actual intellectual functioning (GPA of 2.7 and higher IQ scores[)]"; and (3) although the scores obtained by Dr. Watkins (full scale IQ of 65) were within the range required by Listing 12.05(C), "Dr. Watkins was of the opinion that the test scores appeared to . . . underestimate [Plaintiff's] actual level of intellectual functioning."  (Tr. 33.)

The ALJ's discussion of the IQ scores in the record was an accurate description of the various opinions of the individual psychologists who had rendered the IQ testing. Of the six full scale IQ score results present in the record, only two fall within the range required by Listing 12.05(C): the April 2008 result obtained by Dr. Layne; and the May 2011 result obtained by Dr. Watkins.  The ALJ identified reasons that are evident in the record for rejecting those results.  (Tr. 33.)  For example, Dr. Layne opined that the IQ scores revealed by his testing were "low estimates."  (Tr. 242.)  Further, the results obtained by Dr. Layne – as well as his opinion of Plaintiff's limitations – conflict with

18

other evidence, including other psychologists' opinions regarding Plaintiff's IQ test

results and Plaintiff's grades in high school.  Dr. Hammerly, who assigned Plaintiff a full

scale IQ score 76, opined that this result was "reliable."  (Tr. 199.)  Dr. Watkins opined

that the score Plaintiff obtained in his testing was "an underestimate of her actual level

of functioning," and that her "overall intellectual/adaptive functioning appears to be

borderline."  (Tr. 303, 304.)  The ALJ discussed each of these reasons in his decision.

(Tr. 30, 33.)  Accordingly, substantial evidence supports the ALJ's assessment of

Plaintiff's IQ scores.

       Second, Plaintiff asserts that the ALJ erred in relying on her grades and class

rank to assign less weight to the lower IQ scores in the record, arguing that, because

Plaintiff was in special education classes, her academic achievement is not an accurate

reflection of her actual level of functioning.[5]  This argument lacks merit because, event

to the extent that the ALJ may have erred in this context, the record does not reflect

that Plaintiff was prejudiced by that error.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 F.

App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,'

courts are not required to 'convert judicial review of agency action into a ping-pong

game.'") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).  As

discussed above, the ALJ relied on evidence in addition to the school records to

support his assessment of the scores.  The ALJ pointed to the opinion evidence in the

---

     [5]Plaintiff also asserts that the ALJ "totally ignored" the fact that Plaintiff received special education classes from the third grade until she completed high school.  (Pl. Br. at 11.)  This is incorrect.  In his decision, the ALJ noted Plaintiff's testimony that she was in special education classes in school.  (Tr. 32.)  The ALJ also acknowledged that Plaintiff had an IEP while in school (tr. 33), which called for Plaintiff to receive special education assistance in her classes.

19

record that the lower IQ scores were "low estimates" or "underestimated" Plaintiff's actual intellectual functioning.  (Tr. 33.)  He also pointed to the other IQ scores in the record, which were higher than those obtained by Drs. Layne and Watkins.  (Tr. 30.)  Accordingly, even if the ALJ's reliance on Plaintiff's high school records was error, that error was harmless and presents no basis for remand in this case.[6]

### 3.      Plaintiff's Ability to Perform the Work Identified by the VE

Plaintiff argues that the record does not support the ALJ's conclusion that she could perform the work identified by the VE.  To support her argument, Plaintiff discusses, at length, various items in the record – including the opinions of Drs. Hammerly and Wynkoop regarding Plaintiff's abilities in specific areas; and the fact that Plaintiff was in special education classes – and contends that the ALJ's determination of her RFC did not accurately reflect Plaintiff's capabilities.  This argument presents no basis for remand in this case.

Plaintiff's argument relies on the General Educational Development ("GED") level of the jobs identified by the VE.  In addition to listing the duties of numerous occupations, the DOT also describes various characteristics of each occupation.  Included in these characteristics is the GED level, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  *See* DOT, Appendix C, available at

---

[6]  Plaintiff argues that, because the ALJ erred in rejecting the lower IQ scores, he also erred in failing to consider "the issue of adaptation."  (Pl. Br. at 19.)  Plaintiff devotes several pages of her Brief to this issue, but fails to address the issue in any meaningful legal context.  As discussed above, however, substantial evidence supports the ALJ's decision to reject Plaintiff's lower IQ score.

www.oalj.dol.gov/public/dot/references/dotappc.htm (last visited Oct. 7, 2014).  An

occupation's GED level consists of three measures: reasoning development;

mathematical development; and language development.  *Id*.  According to Plaintiff, the

record evidence establishes that she was only capable of performing work that involved

GED reasoning, math and language levels of 1.  (Pl. Br. 15-16.)  She contends that, for

numerous reasons, the ALJ's hypothetical to the VE did not fully account for this

limitation, and, thus, the ALJ erred in relying on the VE's testimony that Plaintiff could

perform work as a cleaner, sales attendant or cafeteria attendant.

        In this case, the Court need not determine whether the ALJ's hypothetical (or

the RFC determination that mirrored it) accurately reflected all of Plaintiff's limitations

with respect to her intellectual capabilities.  Plaintiff concedes that she was capable of

performing work with GED reasoning, math and language levels of 1.  (Pl. Br. at 15-16.)

One of the positions identified by the ALJ – cleaner/housekeeper (DOT 323.687-014) –

is characterized as having GED reasoning, math and language levels of 1.  *See* DICOT

323.687-014, 1991 WL 672783.[7]  The VE testified that there 13,000 such jobs in Ohio,

and 403,000 in the national economy.  (Tr. 364.)  This Court has concluded that

occupations with fewer positions than the cleaner/housekeeper position existed in

significant numbers in the national economy.  *See, e.g., Williamson v. Comm'r of Soc.*

*Sec.*, 55 F. App'x 287, 288 (6th Cir. 2003) (8,600 jobs constituted a significant number);

_____

        [7] Plaintiff's Brief is accompanied by printouts of two DOT listings.  (Doc. No. 15-
1.)  One of the printouts corresponds to a job identified by the VE – cafeteria attendant.
The other describes the characteristics of a classifier position, which was not identified
by the VE.  The DOT number of that position, however, is one digit off from the DOT
number for the cleaner/housekeeper position.

*Girt v. Astrue*, No. 5:09-cv-1218, 2010 WL 908663, at *4 (N.D. Ohio Mar. 12, 2010)

(finding that 600 jobs state-wide and 35, 000 jobs nationally constituted significant

number of jobs).  Because the ALJ identified a position that Plaintiff, by her own

concession, was capable of performing, there is no basis for remand on this issue.

Plaintiff also argues that the ALJ erred in assuming that her education level was

equivalent to a high school education.  She notes that the record reflects that she

received special education classes, and that she repeated kindergarten.  According to

Plaintiff, substantial evidence does not support the ALJ's conclusion that she had an

education equivalent to a high school diploma, and, thus, the ALJ erred in finding that

Plaintiff had a high school education.[8]  This argument presents no basis for remand in

this case.

The relevant regulations provide that, although the grade level a claimant

achieved is relevant, it is not necessarily dispositive of the issue of that individual's

educational abilities:

> [T]he numerical grade level that you completed in school
> may not represent your actual educational abilities.  These
> may be higher or lower.  However, if there is no evidence to
> contradict it, we will use your numerical grade level to
> determine your educational abilities.

20 C.F.R. § 404.1564(B).  Although there is evidence in the record that arguably

---

[8] It is not clear that the VE relied on Plaintiff's education level in identifying jobs
that corresponded to the VE's hypothetical.  In his description of the hypothetical
individual to the VE, the ALJ did not specifically include a high school education as one
of the criteria. (Tr. 363.)  Rather, he described an individual who was "the same age,
same vocational background" as Plaintiff.  (*Id.*)  Earlier in the hearing, however, Plaintiff
testified that she had graduated from high school, where she attended special
education classes.  (Tr. 358.)  The undersigned will assume that the VE included a high
school education as one of the criteria in the hypothetical.

22

supports Plaintiff's contention that her educational abilities may not correspond with those of a high school graduate, Plaintiff's argument provides no basis for remand.  The relevant regulation assumes that an individual who has completed high school "can do semi-skilled through skilled work." 20 C.F.R. § 404.1564(b)(4).  In this case, the housekeeper/cleaner occupation identified by the VE has a specific vocational profile ("SVP") of 2, *see* DICOT 323.687-014, which corresponds to unskilled work, *see* S.S.R. 00-4p, 2000 WL 1898704 at *3.  Although the ALJ may have assumed an educational level that exceeded Plaintiff's abilities, he concluded that Plaintiff was capable of performing work that fell below the skill level attributed to high school graduates.  Plaintiff fails to explain how – particularly in light of the housekeeper/cleaner occupation identified by the VE –  the ALJ's conclusion on this issue caused her prejudice.  She is not entitled to remand on this basis.

### 4.    Whether the ALJ Sufficiently Developed the Record

Finally, Plaintiff argues that the ALJ failed to sufficiently develop the record at Plaintiff's administrative hearing.  It is well established that an ALJ has a "special duty" to develop the record where a claimant appears without counsel. *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).  "To satisfy this special duty, the [ALJ] must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Id*. (quoting *Gold v. Sec'y of Health, Educ. and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).  However, "the mere fact that a claimant was unrepresented is not grounds for reversal. *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986).  Rather, the Court must "examine each case

23

on its own merits to determine whether the ALJ failed to fully develop the record and therefore denied the claimant a full and fair hearing." *Id*.  For example, in *Lashley*, the Sixth Circuit concluded that the ALJ had failed in his duty to develop the record because the ALJ had relied on the claimant's responses to superficial questions to make his determination, and had failed to follow up on unresolved issues revealed by the ALJ's questioning of the claimant at the hearing. *Id*. at 1052-53.

Here, Plaintiff argues that the ALJ failed in his special duty to develop the record in light of her *pro se* status.  Specifically, she points to the brevity of her hearing, which was 25 minutes long, and contends that the ALJ failed to ask a sufficient number of questions to obtain the information necessary to decide the issues in Plaintiff's case. The Commissioner responds that the ALJ inquired into the relevant areas during the hearing.

This issue is a close question in this case.  As in *Lashley*, Plaintiff's hearing was only 25 minutes long.  Her actual testimony in response to questioning by the ALJ consists of ten pages in the transcript.  (Tr. 353-62.)  The ALJ asked fairly superficial questions.  (*Id*.)  Unlike the ALJ in *Lashley*, however, the ALJ in this case did not rely on Plaintiff's hearing testimony to question her credibility.  Nor did the ALJ rely on Plaintiff's testimony to assign limited or lesser weight to any of the opinions in the record. Although Plaintiff posits several follow up questions that the ALJ could have posed, none of those questions relate to any issue on which the ALJ relied in making his decision in this case.  Plaintiff's proposed questions do not suggest "what possible further information could have been brought forth at the hearing which would have

24

enhanced a determination of disability." *Duncan*, 801 F.2d at 856. Accordingly, "[t]he record in the present case was not adversely affected by the lack of representation or the relatively short hearing," *id*., and this argument presents no basis for remand in this case.

## VI. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

_____

             s/ *Nancy A. Vecchiarelli*_____

             U.S. Magistrate Judge

Date: October 17, 2014

_____

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**